**NATURAL RESOURCES DEFENSE COUNCIL, INC., and Oceana, Inc., Plaintiffs,**

v.

**NATIONAL MARINE FISHERIES SERVICE, et al., Defendants.**

No. 02–1650 CRB.

United States District Court, N.D. California.

Aug. 29, 2003.

Andrew P. Caputo, Natural Resources Defense Council, San Francisco, CA, Eric A. Bilsky, Monica B. Goldberg, Sylvia F. Liu, Oceana Inc., Washington, DC, for Plaintiffs.

Mauricia M.M. Baca, United States Dept. of Justice, Washington, DC, for Defendants.

James P. Walsh, Davis Wright Tremaine LLP, San Francisco, CA, for Intervenors.

## MEMORANDUM AND ORDER

BREYER, District Judge.

This suit involves a challenge by plaintiffs Natural Resource Defense Council and Oceana (collectively "NRDC") to the 2002 Annual Specifications and Management Measures for the Pacific Coast Groundfish Fishery promulgated by defendant National Marine Fisheries Service ("NMFS"). Now before the Court are the parties' cross-motions for summary judgment.

## BACKGROUND

This lawsuit focuses on measures taken by NMFS to allow four west coast groundfish species to recover from significant population declines due to intensive overharvesting. The terms "groundfish" and "rockfish" refer to a group of ocean-floor fish species that live between 50 and 150 years but mature slowly and have low reproductive rates. *See* 14 Administrative Record ("AR") M.47 Attach. at 22. These species play an important ecological role in the coastal ecosystems of California, Oregon, and Washington, and they are a valuable food source for marine mammals, other fish species, and humans. *See* 19 AR B.17 at 18. Fish markets often refer to groundfish as "red snapper" or "rock cod."

NMFS is an agency under the umbrella of the National Oceanic and Atmospheric Administration ("NOAA"), which in turn is part of the Department of Commerce. On the west coast, NMFS manages harvests for eighty-two groundfish species. *See* 26 AR Supp. B.20a at 3–5. NMFS's fisheries program aims to "rebuild and maintain sustainable fisheries, promote the recovery of protected species, and protect and maintain the health of coastal marine habitats." NOAA Fisheries Strategic Plan, http://www.nmfs.noaa.gov/what.htm. Currently, NMFS is working with commercial and recreational fishers as well as environmentalists to rebuild declining fisheries throughout the United States.

On the west coast, NMFS has comprehensively assessed the populations of only about sixteen of the eighty-two groundfish species it manages. *See* 5 AR F.33 at 3. The agency has identified at least seven groundfish species as overfished, and it has acknowledged the "significant possibility" that some of the fish populations it has not assessed are also in decline. *Id.* NMFS has concluded that fishing levels have been "too aggressive for sustainable harvest on the very low productivity west coast rockfish stocks," 3 AR B.14 at 8, leaving the west coast fishery "in a crisis." 5 AR F.33 at 1.

Plaintiffs Natural Resource Defense Council and Oceana (collectively "NRDC") are national nonprofit organizations seeking to protect the environment. NRDC challenges NMFS's 2002 Annual Specifications and Management Measures for the Pacific Coast Groundfish Fishery. Specifically, NRDC challenges NMFS's treatment of four overfished species: dark-blotched rockfish, bocaccio, cowcod, and canary rockfish.

While NMFS's Pacific Fishery Management Council ("Pacific Council") makes annual harvest recommendations for these four species, it only assesses individual groundfish populations periodically, usually on a three-year rotating basis. *See* 50 C.F.R. § 600.315(e); 5 AR F.22 at E–4; 19 AR B.17 at 1. The 2002 specifications that NRDC challenges reflect population as-

sessments made in 2000. *See* 19 AR B.17 at 1; 21 AR H.644 at 3. NMFS has indicated that it will adjust its harvest recommendations when it next assesses the populations of the four groundfish species. *See* Def.'s Br. in Opp. at 22–24.

## DISCUSSION

NRDC claims that the 2002 groundfish regulations violate three federal laws: the Magnuson–Stevens Act ("MSA"), the Administrative Procedure Act ("APA"), and the National Environmental Policy Act ("NEPA"). Summary judgment of any of these claims is appropriate only if the pleadings and evidence establish that: (1) no genuine issue of material fact exists and (2) the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56. An issue is "genuine" if sufficient evidence may lead a reasonable fact finder to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if the fact may affect the outcome of the case. *See id.* at 248, 106 S.Ct. 2505. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997).

## I.  Applicable Statutes

### A.  The Magnuson–Stevens Act

Congress enacted the M.S.A. § to "conserve and manage the fishery resources found off the coasts of the United States," 16 U.S.C. § 1801(b)(1), by "promot[ing] domestic commercial and recreational fishing under sound conservation and management principles." *Id.* § 1801(b)(3). For overharvested fish species, the M.S.A. § directs NMFS to "prevent overfishing,"

*id.* § 1851(a)(1), while, "to the extent possible, minimizing adverse economic impacts on [fishing] communities." *Id.* § 1851(a)(8). NMFS must also promote "efficiency in the utilization of fishery resources," *id.* § 1851(a)(5), and "minimize bycatch" and bycatch mortality. *Id.* § 1851(a)(9). In total, the M.S.A. § contains ten such "national standards," each of which must "be sacrificed to some extent to meeting the others." *Alliance Against IFQS v. Brown,* 84 F.3d 343, 349 (9th Cir.1996).

NRDC and NMFS disagree as to whether the M.S.A. § prioritizes conservation over commerce or commerce over conservation. Generally, the M.S.A. § seeks to achieve conservation and commercial objectives simultaneously. *See id.* §§ 1801(b)(1), 1801(b)(3). The act can be said to prioritize environmental objectives only in the sense that "where two alternatives achieve similar conservation goals, the [preferred] alternative [is the one] that minimizes the adverse impacts on [fishing] communities." 50 C.F.R. 600.345(b)(1).

Pursuant to the MSA, Congress created eight Regional Fishery Management Councils, overseen by NMFS, to propose and administer regional fishery management plans that "will achieve and maintain, on a continuing basis, the optimum yield from each fishery." *Id.* § 1801(b)(4). Optimum yield ("OY") is "the amount of fish which will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities and taking into account the protection of marine ecosystems." 50 C.F.R. § 600.310(f)(1)(I). In the case of an overfished fishery, it refers to the fish quantity "that provides for rebuilding to a level consistent with producing the [maximum sustainable yield][1] in such fishery." *Id.*

---

1.  "Maximum sustainable yield" is "the largest long-term average catch or yield that can be   taken from a stock ... under prevailing eco-

In its Pacific Coast fishery management plan ("FMP"), the Pacific Council establishes annual harvest limits for eighty-two west coast groundfish species. *See* 16 U.S.C. §§ 1852(a)(1)(F), 1852(f); 26 AR Supp. B.20a at 3–5. These harvest limits are meant to achieve "on a continuing basis, the OY from each fishery," 50 C.F.R. § 600.310(a), which means "producing, from each fishery, a long-term series of catches such that the average catch is equal to the average OY." *Id.* § 600.310(f)(1)(ii). NMFS has the authority to revise and approve the harvest limits associated with the FMP, which must conform to the MSA's national standards. *See* 16 U.S.C. §§ 1851(a), 1854(a)(1)(A).

## B. The Sustainable Fisheries Act

In 1996, Congress amended the M.S.A. § by passing the Sustainable Fisheries Act ("SFA") in response to concerns about the overharvesting of marine fish species. *See id.* § 1854(e). Under the SFA, the appropriate fishery management council must create a rebuilding plan for any species that has become overfished. The plan must:

(A) specify a time period for ending overfishing and rebuilding the fishery that shall-

   (i) be as short as possible, taking into account the status and biology of any overfished stocks of fish, the needs of fishing communities ... and

   (ii) not exceed 10 years, except in cases where the biology of the stock of fish, [or] other environ-

mental conditions ... dictate otherwise.

*Id.* § 1854(e)(4).

Recognizing the ambiguity in this provision, NMFS propounded two interpretations for public comment in August and December of 1997. *See* 25 AR P.1–2. Under the first interpretation, if a fish population was biologically capable of returning to its unfished level after a ten-year fishing moratorium, NMFS would select a rebuilding period of up to ten years and limit harvesting to ensure that rebuilding occurred within the specified time period. *See* 62 Fed.Reg. 67,608, 67,609–10 (Dec. 29, 1997). If a fish population could not return to its unfished level within ten years, NMFS would ban harvesting completely until the species returned to its natural level. *Id.*

NMFS developed a second interpretation out of concern that banning fishing completely during a rebuilding period would undermine the MSA's express goal of promoting commercial and recreational fishing. This second interpretation differed from the first in its treatment of fish species that required more than ten years to return to their unfished levels. *Id.* For those species, the rebuilding period could exceed ten years if "warranted by the needs of fishing communities." 63 Fed. Reg. 24,212, 24,231 (May 1, 1998). NMFS would allow limited harvesting during the rebuilding period, which could be no longer than the time required for the species to rebuild under a fishing moratorium plus one mean generation time.[2] *Id.* After considering the public's comments, NMFS issued a National Standards Guideline

---

logical and environmental conditions." *Id.* § 600.310(c)(1)(i).

**2.** For example, a species that could rebuild itself in 12 years under a fishing moratorium and that had a mean generation time of 10

years would be protected by a 12–year harvesting moratorium under the first suggested interpretation. Under the second interpretation, NMFS would allow limited harvests during a rebuilding period of 22 years.

adopting this second interpretation. Under that guideline,

> If the lower limit [on the natural rebuilding period] is ten years or greater, then the specified time period for rebuilding may be adjusted upward to the extent warranted by the needs of the fishing communities ... except that no such upward adjustment can exceed the rebuilding period calculated in the absence of fishing mortality, plus one mean generation time or equivalent period based on the species' life-history characteristics.

*See* 25 AR P.3.

Annual harvest limits for overfished species are keyed to the rebuilding plan for that species. Thus, if a rebuilding plan calls for a twenty-year rebuilding period, annual harvest limits will be set so as to rebuild the stock to its unfished level by the twentieth year. By reassessing fish populations every three years, NMFS can reset annual harvest limits to account for past years in which actual yields may have exceeded (or fallen short of) those years' harvest limits.

## C. The Administrative Procedures Act

The APA requires an agency to "consider[ ] the relevant factors" before making a decision and "articulate[ ] a rational connection between the facts found and the choice made." *NRDC v. Dep't of the Interior,* 113 F.3d 1121, 1124 (9th Cir.1997). Under the APA, a court may only reject an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## D. The National Environmental Policy Act

NEPA establishes a mandatory process for assessing the environmental impacts of federal agency actions. *See* 42 U.S.C. § 4332. In the initial stages of the process, an agency must prepare either an environmental impact statement ("EIS") addressing the environmental consequences of the proposed agency action, or an environmental assessment ("EA") evaluating whether the proposed agency action will significantly impact the environment and thus necessitate a more thorough EIS. *See* 40 C.F.R. § 1508.9. Whether preparing an EIS or an EA, an agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

Here, environmental assessments rather than environmental impact statements are in dispute. An EA must discuss only those alternatives "necessary to permit a reasoned choice," and the discussion can be brief. *See Presidio Golf Club v. National Park Serv.,* 155 F.3d 1153, 1160 (9th Cir.1998) (quoting *Northwest Envtl. Defense Ctr. v. Bonneville Power Admin.,* 117 F.3d 1520, 1538 (9th Cir.1997)). For any action that "significantly affect[s] the quality of the human environment," the EA must assess the environmental impact of the action and any unavoidable adverse effects. *See* 42 U.S.C. § 4332(2)(C).

## II. Darkblotched Rockfish Harvest Limit

NRDC claims that NMFS violated the MSA, APA, and NEPA by increasing the darkblotched rockfish harvest limit in 2002 despite evidence that the darkblotched rockfish population had declined more significantly than NMFS previously believed. In 2001, NMFS believed that the population was at 22% of its unfished biomass; one year later, the agency discovered that the darkblotched rockfish population had actually fallen to 12% of its unfished level.

*See* 67 Fed.Reg. 10,490, 10,491 (March 7, 2002) (19 AR C.58). Notwithstanding this discovery, NMFS raised the harvest limit from 130 metric tons ("mt") in 2001 to 168 mt in 2002. *See id.*

### A. MSA

Plaintiffs contend that NMFS violated the M.S.A. § by increasing the annual harvest limit for the darkblotched rockfish in the face of evidence that the rockfish was scarcer than originally thought. While this decision may appear at first blush to be irreconcilable with the agency's duty to prevent overfishing and rebuild overfished stocks, the explanation for the increased limit lies in the effect of the population correction on the length of the rockfish rebuilding plan.

Working under the flawed assumption that the rockfish population was at 22% of its unfished biomass, the Pacific Council determined that the population could be fully rebuilt within ten years. Accordingly, as directed by the National Standards Guideline interpreting the SFA, the Council set ten years as the rebuilding period for the species. When it became apparent that the population was in fact at only 12% of its unfished status, the Council concluded that the population required 14 years to return to its unfished level. Accordingly, pursuant to the Guideline, the Council calculated the maximum allowable rebuilding time to be 47 years (14 years for natural regeneration plus 33 years mean generation time). *See id.* The Council then adopted, and NMFS approved, a 34–year rebuilding period that fell within the maximum allowable time. *See id.* Because the rebuilding period increased significantly, the Pacific Council was able to set a harvest limit for 2002 that exceeded the harvest limit for 2001 despite the revised population assessment.

Thus understood, the increase in the harvest limit from 130 to 168 mt flowed directly and predictably from the adjustment in NMFS's estimate of the rockfish population. Accordingly, the issue is not whether the increase was arbitrary and capricious on its face, but rather whether the interpretation of the SFA adopted by NMFS-the result of which was to permit the increase-runs afoul of the MSA.

The parties agree that the APA standard of review applies to NMFS's interpretation of the SFA. Under the APA, a court may only reject an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ NMFS asserts that its interpretation of the SFA is entitled to deference under *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* a court reviewing an agency's construction of a statute must first determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. If Congressional intent is unclear and the statute is "silent or ambiguous with respect to the specific issue," the court must defer to the agency's interpretation of the statute unless that interpretation is unreasonable. *Id.* at 843, 104 S.Ct. 2778. The court may not impose its own construction on the statute, as it would in the absence of an agency interpretation. *See id.*

"[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and ... the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead,* 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Such congressional delegation need not be explicit. Rather, "[d]elegation of such authority may be shown

in a variety of ways." *Id.* at 227, 121 S.Ct. 2164. In particular, "a very good indicator of delegation meriting *Chevron* treatment [is] express congressional authorization[ ] to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." *Id.* at 229, 121 S.Ct. 2164; *see also Yellow Trans., Inc. v. Michigan,* 537 U.S. 36, 44, 123 S.Ct. 371, 377, 154 L.Ed.2d 377 (2002).

■ NRDC urges the Court to deny *Chevron* deference to NMFS's interpretation of the SFA's rebuilding-period provision. NRDC points out that this interpretation was codified in a National Standards Guideline ("NSG"), and that the M.S.A. § explicitly states that these guidelines do not have the force of law. *See* 16 U.S.C. § 1851(b). Under *Mead,* however, the dispositive inquiry is not whether a particular agency interpretation has legal force of its own, but rather whether the interpretation was promulgated in the exercise of the agency's general authority to make rules for rebuilding depleted fish stocks. *See* 533 U.S. at 226–27, 121 S.Ct. 2164. Congress expressly delegated authority to NMFS to set rebuilding periods for overfished species consistent with the requirements of the SFA. In order to exercise that authority, NMFS had to interpret the SFA's rather ambiguous rebuilding-period provision. While the NSG that codifies the agency's interpretation of that provision does not have legal force of its own, it was plainly adopted in the exercise of the agency's general authority to make rules concerning rebuilding. This is sufficient to warrant *Chevron* deference. *Cf. Yellow Trans.,* 123 S.Ct. at 377 (agency's interpretation of fee-cap provision in federal statute following period of notice-and-comment rulemaking was entitled to *Chevron* deference); *NRDC v. Daley,* 209 F.3d 747, 752 (D.C.Cir.2000) (analyzing NMFS's disputed interpretations of the SFA under *Chevron*).

■ While judicial review under the deferential *Chevron* standard "is neither rote nor meaningless," *Daley,* 209 F.3d at 752, an agency's interpretation should not be disturbed when it was "based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. One of the stated purposes of the M.S.A. § is "to promote domestic commercial and recreational fishing under sound conservation and management principles." 16 U.S.C. § 1801(b)(3). Moreover, when carrying out its mandate to "prevent overfishing," *id.* § 1851(a)(1), NMFS is directed by the act to "minimize adverse economic impacts on [fishing] communities." *Id.* § 1851(a)(8). Faced with a choice between an interpretation of the SFA that requires a moratorium on harvesting of fish species that take more than ten years to regenerate naturally, and an interpretation that permits limited harvesting over the course of a longer rebuilding period, NMFS selected-after public notice and comment-the latter interpretation. In light of MSA's dual conservationist and commercial objectives, an interpretation that accommodates both objectives, rather than selecting one to the exclusion of the other, is permissible.

Because the 2002 rockfish harvest level was set in accordance with the rebuilding plan that NMFS developed pursuant to a reasonable interpretation of the SFA, the increase in the harvest level in 2002 did not violate the MSA.

## B. APA

NRDC maintains that NMFS's decision to increase the darkblotched rockfish harvest limit in 2002 violated the APA's requirement that an agency consider relevant factors before making a decision and articulate a reasoned connection between the facts found and the choice made. *See NRDC v. Dep't of the Interior,* 113 F.3d at

1124. NRDC argues that NMFS considered economic factors to the exclusion of relevant biological concerns in its determination of the darkblotched rockfish rebuilding period and, by extension, the harvest limit.

The record shows that under the harvest limit that NMFS adopted for 2002, the darkblotched rockfish stock has a 50% chance of rebuilding within the designated time period. *See* 67 Fed.Reg. at 10,491. Contrary to plaintiffs' suggestion, the fact that the agency selected a rebuilding period that would lead to recovery with a particular degree of probability indicates that the length of the period was neither arbitrary nor unrelated to biological concerns. At least one federal circuit has found a 50% probability of rebuilding to be reasonable under the MSA. *See Daley,* 209 F.3d at 755. The fact that NMFS set harvest limits consistent with that standard strongly suggests that the agency did incorporate relevant biological considerations into its selection of the 2002 harvest limit, as required by the APA.

### C. NEPA

NRDC claims that NMFS's environmental assessment ("EA") for the 2002 darkblotched rockfish harvest level violated NEPA by failing to address (1) a reasonable range of alternatives to setting the harvest limit at 168 mt, and (2) the environmental consequences of selecting that harvest level. However, the EA did discuss the specifics of implementing four darkblotched rockfish harvest limits: 130 mt, 157 mt, 161 mt, and 181 mt. *See* 19 AR B.17 at 50–51. The EA also addressed the environmental consequences of each of these limits. *See id.* at 5–6. The 168 mt harvest limit that NMFS selected falls within the range discussed in the EA. The only issue, therefore, is whether NMFS addressed the different harvest limits in sufficient detail to satisfy NEPA.

In two recent cases, NRDC successfully challenged NMFS's discussion of alternative harvest levels. First, in *NRDC v. Evans,* 168 F.Supp.2d 1149 (N.D.Cal.2001), NMFS was found to have violated NEPA by considering only alternative harvest levels that NMFS knew to be flawed. *See id.* at 1160. A year later, in *Pacific Marine Conservation Council, Inc. v. Evans,* 200 F.Supp.2d 1194 (N.D.Cal.2002), the court held that NMFS violated the act by failing to consider two particularly salient alternatives. *See id.* at 1207. By contrast, in the present case plaintiffs allege neither that the alternative harvest levels considered by NMFS were known to be deficient or that NMFS failed to consider especially viable alternatives. Rather, plaintiffs' claim in this case focuses on the brevity of the agency's treatment of the various alternatives it considered.

■ NRDC has not identified any authority for the proposition that NEPA requires an agency to analyze alternatives with a particular level of detail. In the Ninth Circuit, the "touchstone [of NEPA compliance] is whether an [EA's] selection and discussion of alternatives fosters informed decision-making and informed public participation." *California v. Block,* 690 F.2d 753, 767 (9th Cir.1982), *quoted in Headwaters, Inc. v. Bureau of Land Mgmt.,* 914 F.2d 1174, 1180 (9th Cir.1990). Here, NMFS's environmental assessment discussed both the specifics of implementing four darkblotched rockfish harvest limits and the environmental impact associated with each of those limits. *See* 19 AR B.17 at 5–6, 50–51. This was sufficient to permit an informed choice, and hence to satisfy the requirements of NEPA.

### III. Bocaccio, Canary Rockfish, and Cowcod Harvest Limits

Plaintiffs allege that the 2002 harvest limits for bocaccio, canary rockfish, and

cowcod, like the harvest limit for dark-blotched rockfish, violate the MSA, the APA, and NEPA. Whereas the dark-blotched-rockfish challenge is grounded in the agency's interpretation of the SFA, the challenges with respect to these other species are based on plaintiffs' contention that NMFS should have reduced the 2002 harvest limits to account for actual yields in 2000 and 2001 that exceeded the harvest limits for those years. By carrying over the 2001 limits into 2002 without even considering alternative levels, plaintiffs argue, NMFS breached its obligations under all three acts.

There is no dispute that actual harvests of these species in 2000 and/or 2001 exceeded their respective harvest limits, often by large amounts. For example, although the harvest limit for bocaccio in those years was 100 mt, 233 mt were harvested in 2000 and 214 mt were caught in 2001. *See* 67 Fed.Reg. 69,704, 69,706 (Nov. 19, 2002). Given that NMFS has determined that the southern west coast bocaccio stock is at only 2.1% of its unfished biomass, *see* 26 AR Supp. B.20a, at 3–7, the consequences of such overharvesting are potentially grave.

The purpose of harvest limits, however, is to achieve, *"on a continuing basis,* the OY [optimum yield] from each fishery." 50 C.F.R. § 600.310(a) (emphasis added). In other words, harvest limits must be set so as to "produc[e], from each fishery, a long-term series of catches such that the *average* catch is equal to the *average* OY." *Id.* § 600.310(f)(1)(ii) (emphasis added). Accordingly, if a particular year's harvest exceeds the harvest limit for that year, underharvesting in subsequent years may even out the excesses, or adjustments can be made to future years' limits so as to

achieve the fishery's optimum yield over the longer term.

Plaintiffs contend that adjustments should have been made to harvest limits in 2002 to account for overages in 2000 and 2001. As a matter of course, however, NMFS makes adjustments to rebuilding plans-and hence to annual harvest limits-only after conducting an assessment of the population of a particular species. In light of resource limitations, NMFS reassesses each species's population only periodically-usually once every three years. *See* 5 AR F.22 at E–4 (noting that current funding levels support stock assessments of only 6–8 species annually); 19 AR B.17 at 1. In the years between assessments, the agency deals with overharvesting through "management measures" rather than by adjusting harvest limits. When a periodic stock assessment reveals that neither management measures nor natural year-to-year variations in harvest levels have succeeded at keeping the average catch in line with the average OY, NMFS makes adjustments to the OY going forward.

The 2002 harvest limits for bocaccio, canary rockfish, and cowcod were based on the most recent stock-assessment data available to the agency at the time. Accordingly, NMFS responded to overages in 2000[3] not by changing the harvest limits, but rather by implementing interim management measures (e.g., in the case of cowcod, establishing no-fishing conservation areas in high-density habitats). NMFS has represented that "[w]hen the [Pacific] Council prepares its next stock assessment for [these species], the Council will evaluate the effect of the overage to determine whether it has been compensated for, or whether changes ultimately need to be made to the OY." Def.'s Br. in Opp. 23.

---

**3.** Defendants claim that final catch statistics for 2001 were not available at the time the

2002 specifications were being developed.

The narrow question before the Court is whether the agency's decision not to decrease harvest limits for these species in 2002 violated the MSA, APA, or NEPA. Because this decision was the natural outgrowth of the policy described above, the broader but inseparable question is whether that policy is itself reconcilable with the agency's duties under these statutes.

As discussed above, the APA directs federal agencies to consider all relevant factors before making a decision and to articulate a rational connection between the facts and that decision. *See NRDC v. Dep't of the Interior*, 113 F.3d at 1124. An agency decision runs afoul of the APA only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ Here, NMFS's decision to maintain harvest limits at their 2001 levels was reasonably connected to-indeed, was dictated by-the agency's policy of resetting harvest limits only after conducting a stock reassessment. In turn, that policy, which is a product of the limited resources available to the agency to manage eighty-two different fish species, was neither an abuse of discretion nor contrary to law. *Cf. Northern Alaska Envtl. Ctr. v. Lujan*, 872 F.2d 901, 905–06 (9th Cir.1989) ("[I]n selecting the appropriate method to [prioritize mining claims], the [Interior] Secretary must consider the most efficient allocation of agencies' resources and personnel."). Accordingly, plaintiffs' APA claim fails as a matter of law.

■ For similar reasons, plaintiffs cannot prevail on their NEPA claim. The focus of that claim is that the agency's failure to consider multiple potential har-

vest limits is an *ipso facto* violation of NEPA. While "[c]onsideration of alternatives is critical to the goals of NEPA," *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228–29 (9th Cir.1988), an agency need consider only "those alternatives necessary to permit a reasoned choice." *Presidio Golf Club*, 155 F.3d at 1160. Because the stocks of bocaccio, canary rockfish, and cowcod were not reassessed prior to setting harvest limits for 2002, the agency did not have the information it needed to revise those limits from their 2001 levels. Accordingly, consideration of alternative harvest limits would not have enabled the agency to make a more reasoned choice. Accordingly, there was no NEPA violation.[4]

■ Finally, neither the failure to decrease 2002 harvest limits nor the agency's policy of revising such limits only after a stock is reassessed violates the MSA. For NMFS to be in violation of the MSA, plaintiffs must show that the agency violated its duty to prevent overfishing. As discussed above, however, the M.S.A. § does not require NMFS to ensure that any particular year's harvest will fall within that year's harvest limit. Rather, such limits are set with an eye to ensuring that on average, across the duration of a rebuilding plan, actual harvests are in line with optimum yield. Accordingly, the failure to reduce harvest limits for bocaccio, canary rockfish, and cowcod in 2002, absent more, does not constitute an M.S.A. § violation.

## IV. Cowcod Bycatch

NMFS imposed a moratorium on intentional harvesting of cowcod in 2002. Ac-

---

4. Plaintiffs further argue that the EA's consideration of the environmental consequences of exceeding the harvest limits was not "meaningful" enough. While the Court agrees that an EA was required even though the agency's "action" was to leave harvest limits un-

changed, *see Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1115 (9th Cir.2002), the Court finds that the EA's analysis was adequate to permit informed decision-making under the circumstances. *See Headwaters*, 914 F.2d at 1181.

cordingly, the 2002 harvest limit for cowcod–4.8 mt-was in effect a limit on the quantity of cowcod that could be caught by fishers unintentionally while fishing for other species. See 67 Fed.Reg. 1,555, 1,567–69 (Jan. 11, 2002) (19 AR C.54). Such fish are referred to as "bycatch."

■ Plaintiffs argue that NMFS did not give adequate consideration to past levels of cowcod bycatch before setting the 2002 harvest limit at 4.8 mt. This argument is merely a variant of plaintiffs' more general argument, considered above, that NMFS failed to consider past harvest levels when setting 2002 harvest limits. For the same reasons that the agency did not violate the MSA, APA, or NEPA by failing to adjust 2002 limits in response to data regarding *intentional* harvests in 2000 and 2001, NMFS did not violate the statutes by failing to incorporate data on *accidental* harvests.

The 2002 harvest limit for cowcod was set in accordance with a cowcod stock assessment conducted in 2000. Should the results of the next such assessment reveal that actual levels of cowcod bycatch have threatened the viability of the cowcod rebuilding plan, NMFS must adjust harvest limits going forward to satisfy its obligations under the MSA. Until the agency fails to do so, plaintiffs' challenge is premature.

## V. Bycatch Assessment and Minimization

Finally, NRDC contends that NMFS's groundfish specifications for 2002 breached the M.S.A. § by failing to "consider and adopt adequate requirements to assess and reduce bycatch" of all west coast groundfish species. Pl.'s Reply Br. at 16. Pursuant to provisions added to the M.S.A. § in 1996, NMFS must "establish a standardized reporting methodology to assess the amount and type of bycatch occurring" and implement measures that minimize by-

catch and bycatch mortality. 16 U.S.C. §§ 1851(a)(9), 1853(a)(11).

In *Pacific Marine Conservation Council, Inc. v. Evans,* 200 F.Supp.2d 1194 (N.D.Cal.2002), NMFS was found to have violated the M.S.A. § by failing to discharge its bycatch assessment and minimization obligations for the west coast groundfish fishery. See *id.* at 1203. Plaintiffs' argument in this case amounts to a claim that NMFS has failed to modify its practices in response to the judgment in *Evans.* That claim should be addressed to the court that decided *Evans* and will not be considered here. See *NRDC v. Evans,* 243 F.Supp.2d 1046, 1059 (N.D.Cal. 2003) (directing parties to file periodic reports concerning "defendants' progress toward implementing the court's previous orders").

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is hereby GRANTED as to all claims. Plaintiffs' cross-motion for summary judgment is DENIED.

**IT IS SO ORDERED.**