**MONTANA WILDERNESS ASSOCIATION** a non-profit corporation, and, **Curley Youpee**, an enrolled member of the Fort Peck Tribes, individually, Plaintiff,

v.

Tom **FRY**, Acting Director, U.S. Bureau of Land Management; Mat Millenbach, Director, Montana–Dakotas State Office, U.S. Bureau, of Land Management; Jamie Rappaport Clark, Director, U.S. Fish & Wildlife Service; U.S. Bureau of Land Management; U.S. Fish & Wildlife Service; and Macum Energy, Inc., a Montana corporation, Defendants.

No. CV 00–39–GF–DWM.

United States District Court,
D. Montana,
Great Falls Division.

March 31, 2004.

663

Cathy J. Lewis, Ugrin Alexander Zadick & Higgins, Great Falls, MT, for plaintiff.

George F. Darragh, Jr., Office of the U.S. Attorney, Great Falls, MT, Alan L. Joscelyn, Gough Shanahan Johnson & Waterman, Helena, MT, William P. Pendley, Michael P. Adams, D. Andrew Wight, Mountain States Legal Foundation, Lakewood, CO, Gary G. Broeder, Broeder Law Office, Billings, MT, for defendants.

## ORDER

MOLLOY, Chief Judge.

## I. INTRODUCTION

This case arises from Defendant Bureau of Land Management's sale of three oil and gas leases to Defendant Macum Energy, Inc. on September 28, 1999, and from BLM's decision granting an unrelated pipeline right-of-way to Macum Energy on November 4, 1999. The leases and pipeline are in Blaine County, north central Montana, in an area of the Upper Missouri Breaks commonly known as the Bullwacker, named after a creek running through the area. The Bullwacker area is 30 miles south of Zortman, Montana, and 50 miles south of Chinook, Montana. *Missouri Breaks Wilderness Inventory,* Roadless Area Description and Recommendations, Plaintiffs' Reply Brief, Tab C, at 3–11. It is comprised of 27,382 federal acres and 640 state acres. *Id.* It is bounded by Cow Creek Road to the north, private land to the south, and Gist Branch Road to the east and south. *Id.*

In designating this area part of a National Monument in 2001, President Clinton stated:

> The Bullwacker area of the monument contains some of the wildest country on all the Great Plains, as well as important wildlife habitat. During the stress-inducing winter months, mule deer and elk move up to the area from the river, and antelope and sage grouse move down to the area from the benchlands. The heads of the coulees and breaks also contain archaeological and historical sites, from teepee rings and remnants of historic trails to abandoned homesteads and lookout sites used by Meriwether Lewis.

Proclamation 7398, *Establishment of the Upper Missouri River Breaks National Monument* (Jan. 17, 2001), Plaintiffs' Statement of Uncontroverted Facts, Tab E, at 6.

Plaintiffs contend BLM violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* (2000), the Endangered Species Act of 1973(ESA), 16 U.S.C. §§ 1531–1544 (2000), the National Historic Preservation Act of 1966 (NHPA), 16

U.S.C. §§ 470–470x (2000), the Federal Land Policy and Management Act of 1976 (FLPMA), 43 U.S.C. § 1701 *et seq.,* and the Wild and Scenic Rivers Act (WSRA), 16 U.S.C. § 1271 *et seq.* Plaintiffs filed suit in March 2000, five months after the lease sale and three months after the right-of-way was granted. They did not file any administrative claims prior to filing this suit.

All parties moved for summary judgment. Oral argument was held October 22, 2003. In my view, the plaintiffs are correct. The law was not followed as the Congress requires and the President intended.

## II. STANDARD OF REVIEW

The substantive statutes under which the parties have moved for summary judgment do not provide an independent basis for review. The action is therefore governed by the Administrative Procedure Act (APA), which permits judicial review of final agency action. 5 U.S.C. § 706. Judicial review under the APA is limited to the question of whether the BLM acted arbitrarily, capriciously, or otherwise not in accordance with the law. 5 U.S.C. § 706.

In making its determination, the Court must consider whether the agency's decisions were based on a consideration of the relevant factors and determine whether the agency made "a clear error of judgment." *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The Court's review is limited to the information that was before the agency at the time it made its decision. *Friends of the Earth v. Hintz,* 800 F.2d 822, 828–29 (9th Cir.1986).

## III. FACTUAL BACKGROUND

### A. Lease Sales

On September 28, 1999, BLM sold three oil-and-gas leases to Macum Energy in a competitive sale at the Montana BLM office in Billings, Montana. Administrative Record (A.R.), Exhibit A. The leases are denominated MTM–89473, A.R. Exh. A, Tab 9–a; MTM–89474, A.R. Exh. A, Tab 10–a; and MTM–89482. A.R. Exh. A, Tab 11–a. The BLM identified the parcels earlier in the year, and determined through use of its Documentation of Land Use Plan Conformance and NEPA Adequacy (DNA) worksheets that leasing of each parcel complied with NEPA. A.R. Exh. A, Tabs 9–d, 10–d, 11–d. Specifically, the BLM determined that leasing complied with the 1988 West HiLine Resource Management Plan Environmental Impact Statement (RMP/EIS).

Parts of the leases are located on land that was designated the Upper Missouri River Breaks National Monument ("National Monument") in January 2001. Then–Secretary of the Interior Bruce Babbitt announced plans to place restrictions on this area in May 1999 pending special designation of the legal status of the land. Govt. Brief at 9. In July 1999, in response to local opposition, Secretary Babbitt announced he would not place new restrictions on the area pending special designation. *Id.* The lease sales took place three months later. *Id.*

Although the proclamation establishing the National Monument prohibits further oil and gas leasing, it protects valid existing oil and gas lease rights. Plaintiffs' Facts, Tab E, at 7 ("The Secretary of the Interior shall manage development on existing oil and gas leases within the monument, subject to valid existing rights, so as not to create any new impacts that would interfere with the proper care and management of the objects protected by this proclamation.").

The Upper Missouri National Wild and Scenic River Corridor is closed to mineral

leasing, as are Wilderness Study Areas including Cow Creek, Ervin Ridge, Woodhawk, Stafford and Dog Creek. Govt. Brief at 8. Neither the leases nor the pipeline are within any of these areas. *Id.*

BLM placed notices of the lease sales at various of its Montana offices and on its website. A.R. Exh. A, Tab 1, 2, 4. However, because BLM determined that its obligations under NEPA regarding the lease sales were met through the West HiLine RMP/EIS, it did not prepare an EA or issue a Finding of No Significant Impact (FONSI). Nor did it mail notices to interested parties, or publish notice in any publications or newsletters.

**B. Pipeline Right–of–Way**

On September 9, 1999, Macum applied for a pipeline right-of-way in the Bullwacker to serve production from existing wells. A.R. Exh. H, Tab 1. This right-of-way is unrelated to the leases granted on September 28, 1999.

In response, the agency prepared an EA, and issued a Finding of No Significant Impact (FONSI) and Record of Decision (ROD) on October 27, 1999. It did not circulate the EA or the FONSI, nor did it publish notices of the EA, FONSI, or the right-of-way grant.

BLM also contracted with a consultant who prepared a Cultural Resources Inventory of the right-of-way area. Exh. H, Tab 5. The consultant inspected the area on November 1, 1999. Exh. H, Tab 5, at 5. He sent his report to the BLM on November 5, 1999. Exh. H, Tab 5. The consultant reported a stone ring, which he posited is a former Native American tipi site from an indeterminate age, 54 feet from the right-of-way. *Id.* at 3. The consultant determined that the site would not be affected by the pipeline. *Id.* at 5.

An addendum to the report was prepared on December 8, 1999. Exh. H, Tab 7. It addressed 17 additional acres, and reported no archaeological sites. *Id.* at 3.

The BLM granted the right-of-way to Macum on November 4, 1999—one day before it received the report from its archaeological consultant. Exh. H, Tab 6. Pipeline construction took place that winter; the pipeline is currently used to transport natural gas.

**C. NEPA/ESA Documents**

As evidence of its compliance with NEPA and ESA in its decisions to sell the three leases, BLM relies upon the 1981 Lewistown District Oil and Gas Leasing Environmental Assessment (EA) and the West HiLine Resource Management Plan Environmental Impact Statement (RMP/EIS). As evidence of its compliance with NEPA and the NHPA for the pipeline right-of-way, it relies upon the EA it prepared in the fall of 1999, Exh. H, Tab 3, and the cultural resource survey prepared on its behalf. Exh. H, Tabs 5, 6.

*1. West Hi Line RMP/EIS*

The BLM states that the challenged leases were issued in compliance with the Final West HiLine RMP/EIS, which was released in 1988. Exh. D. Plaintiffs contend the RMP/EIS did not address oil and gas leasing, and cannot be used to fulfill BLM's obligations under NEPA or the ESA.

The West HiLine RMP/EIS is a programmatic document, designed to "provide a master plan for managing and allocating public land resources within the planning area over the next 10 to 15 years." Exh. D, at 3. The document's self description says it is "preced[ing] the activity planning level. The activity plan is a site-specific, detailed plan that may precede actual site development." Exh. D, at 3.

The RMP/EIS planning area includes 626,098 surface acres and 1,328,014 sub-

surface acres administered by the BLM. Exh. D, at 1. The RMP/EIS identified and resolved five primary land-use issues in the planning area: 1) it identified lands for retention, disposal, and acquisition; 2) it amended existing designations for open, limited or closed to off-road-vehicle use areas; 3) it identified areas not suitable for transmission and communication site right-of-way location; 4) it identified areas where management emphasis may be required (Kevin Rim, Sweet Grass Hills, and Cow Creek); and 5) it determined recreation management direction for the Upper Missouri National Wild and Scenic River Corridor. Exh. D, at 3.

As implied by this list, the West HiLine RMP/EIS did not evaluate the environmental impacts of oil and gas leasing in the planning area. Oil and gas management is addressed in the Management Common to All Alternatives section of the RMP/EIS. Exh. D, at 4. The management alternatives discussed in that section are *not* analyzed in the EIS. Exh. D, at 7, Figure 2.1. Rather, they reflect decisions made in previous planning documents:

> The guidance given in the Management Common to All Alternatives section has been carried forward from existing laws, regulations and previous planning efforts. It is current, valid guidance which will be followed *no matter which alternative is selected* and is a substantial portion of the RMP.

Exh. D, at 7 (emphasis added). The 1981 Lewistown District Oil and Gas EA is referenced as being one of the valid decisions "brought forward" into the RMP/EIS. Exh. D, at 8.

Appendix 1.3 to the RMP/EIS, *Reasonably Foreseeable Development of Oil & Gas Resources,* discussed oil & gas production levels prior to 1988, and predicted the reasonably foreseeable future of oil & gas development in the planning area. Addi-

tionally, it discussed possible impacts on a variety of resources. Exh. D. at A-13—A-55. It did not do this in the context of a range of alternatives, however; it simply outlined broad impacts expected to occur from the projected level of oil and gas development.

Moreover, Appendix 1.3 was added to the Final RMP/EIS after the DEIS stage. Exh. D at ix. Because it was not part of the Draft RMP/EIS, it was not available for public comment or review.

The BLM published a Notice of Intent to announce the RMP/EIS planning process in December 1983. Exh. D, at 45. It held several meetings and elicited public comment on the Draft RMP/EIS from June 1987 through September 1987. Exh. D, at 46, Table 5.1. With one exception, none of the public comments address impacts from oil and gas leasing. The one exception to this are the numerous comments directed toward mining in the Sweet Grass Hills, which was identified as an Area of Environmental Concern in the RMP/EIS, and an Area of Critical Environmental Concern in the modified Record of Decision (ROD). Exh. C, Tab 2 (Jan. 1992), at 1.

Plaintiffs' contention that the West Hi-Line RMP/EIS was not an oil and gas EIS is supported by the plain language of the RMP/EIS. The RMP/EIS unequivocally states that it is addressing management issues *other than* oil and gas management. Exh. D, at 4, 7. Although oil and gas management was identified as an issue during the scoping process, it was considered to have been addressed earlier in the Lewistown Oil and Gas EA. Exh. D, at 4, "Issues Previously Addressed." Additionally, in response to a question posed at a public meeting, "How does the draft [EIS] propose managing the mineral resources, especially hard rock minerals?," the BLM replied:

Hardrock minerals will be managed under the 43 CFR 3809 regulations which are applicable where BLM is the surface managing agency. For additional information and text revisions please refer to the Mineral Resource Management section of the Management Common to All Alternatives description in Chapter 2. Exh. D, at 167, No. 175. That section, as noted earlier, incorporates earlier decisions and does not analyze any alternatives. Exh. D, at 7, Figure 2.1.

Thus, the West HiLine RMP/EIS did not analyze potential environmental impacts of various oil and gas management alternatives. To the extent the RMP/EIS is an oil and gas NEPA document, therefore, it must come from its incorporation of the 1981 Lewistown Oil and Gas EA.

### 2. *1981 Lewistown District Oil and Gas Leasing EA*

The Oil and Gas Leasing EA upon which the RMP/EIS relies was prepared by the Lewistown District of the BLM in 1981. A.R. Exhibit F. The proposed action addressed by the EA "includes all practices by the BLM and the USGS in issuing and administering oil and gas leases over the approximately 50 million subsurface acres under the management of the BLM in the three-state area [Montana, North Dakota and South Dakota]." Exh. F, at 2. The EA compared the impacts of the proposed action, which was "the continuation of BLM's oil and gas leasing program in Montana and the Dakotas in order to make Federally administered oil and gas resources available to the region and nation," Exh. F at 1, with the impacts of a no-action alternative, which was to halt all oil and gas leasing. Exh. F at 67–70. No other alternatives were considered.

Although the 1981 EA begins by assessing oil and gas leasing in three states, it goes on to describe the resources in the Lewistown District—a much smaller area than Montana and the Dakotas, but almost a third of Montana nonetheless. Exh. F, 71–82; 52(map). Chapter 2 discusses in general terms the possible impacts of oil and gas leasing on 12 resources: 1) climate and air quality, 2) geology and topography, 3) soils, 4) vegetation, 5) water, 6) animals, 7) recreation, 8) aesthetics, 9) wilderness, 10) prehistoric and historic features, 11) economic and social conditions, and 12) land use. Exh. F, 34–58. It then discusses mitigation measures in each of these categories. Exh. F, 59–63. Finally, it mentions residual impacts on each resource. Exh. F, 64–66. Nowhere does the EA discuss the possible number of roads that might be needed, the number and miles of pipeline that might be laid, or the number of holding and pumping facilities that might be required. In other words, its analysis is extremely general.

Attached to the back cover of the EA is a memorandum from the Lewistown District Manager dated March 27, 1979—2.5 years prior to the date the EA was released—titled, "Recommendation of Environmental Statement on EAR *MT–060–06–9–4*, Lewistown D.O. Oil & Gas Programmatic." A.R., Exh. F. It states:

> After due consideration of all relevant data, including the BLM Planning System, the proposed action does not constitute a major federal action and will not require an environmental impact statement.

A.R., Exh. F (inside back cover, unnumbered). Interestingly, this appears to be a finding of no major federal action rather than a Finding of No Significant Impact (FONSI), which perhaps explains its creation two years prior to the EA. No other FONSI appears in the record.

### 3. *Pipeline Right–of–Way EA*

In response to Macum Energy's application for a pipeline right-of-way in Septem-

ber 1999, BLM prepared an EA. Exh. H, Tab 3. Although it does not explicitly say so, the EA appears to "tier" to the West HiLine RMP/EIS. The EA refers the reader to the RMP/EIS for discussion of soil, water, air, minerals, wilderness, roads and trails, cultural resources, and hazardous or solid wastes. Ex. H, Tab 3, at 5. It states in the Rationale for Decision that it is "in conformance" with the West HiLine RMP/EIS. Exh. H, Tab 4. On October 27, 1999, the BLM issued a Finding of No Significant Impact (FONSI) and a Record of Decision (ROD). Exh. H, Tab 4.

The pipeline EA examined the proposed action, which was issuing Macum the right-of-way grant, and a no-action alternative. Exh. H, Tab 3, at 4. The evaluation of alternatives focused primarily on possible effects to soil, concluding that long-term impacts could be mitigated through right-of-way stipulations. Exh. H, Tab 4, at 7.

## IV. ANALYSIS OF CLAIMS

### A. Jurisdictional Defenses

Defendants have raised a number of jurisdictional defenses that must be resolved before addressing the merits of this case. Specifically, they claim Plaintiffs failed to exhaust their administrative remedies, and that their claims should be barred by laches and/or mootness. At oral argument, Defendant Macum also contended that either the 90–day statute of limitations found in the Mineral Lands Leasing Act or the general six-year statute of limitations should operate to bar Plaintiffs' challenges. Macum also challenges Plaintiff Youpee's standing under NHPA. For the following reasons, I find that none of these defenses

applies, and the case can proceed to the merits.

### 1. Exhaustion of Remedies

■ BLM contends that this Court lacks jurisdiction to hear Plaintiffs' claims on the grounds that Plaintiffs have failed to exhaust their administrative remedies prior to bringing suit. The APA provides:

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review ... [E]xcept as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section ... unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

5 U.S.C. § 704. Under § 704, only final agency action is subject to judicial review. An agency decision is not final if (1) the agency has adopted a rule requiring an administrative appeal before judicial review; and (2) the initial decision would be inoperative pending appeal. *Darby v. Cisneros,* 509 U.S. 137, 152, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). Thus, in order to determine whether Plaintiffs were required to exhaust administrative remedies, I must turn to the applicable regulations.

Under 43 C.F.R. § 3165.4(a), a party **may** appeal BLM's decisions concerning oil and gas leasing and operations to the Interior Board of Land Appeals ("IBLA").[1] Further, any person who is aggrieved by a final order of the Secretary of Interior under this section *may seek review* of such order in the United States District Court for the judicial district in which the alleged violation occurred. 43 C.F.R. § 3165.4(f).

**1.** 43 C.F.R. § 3000.4 provides:
Except as provided in §§ 3101.7–3(b), 3120.1–3, 3165.4, and 3427.2 of this title, any party adversely affected by a decision of

the authorized officer made pursuant to the provisions of Group 3000 or Group 3100 of this title shall have a right of appeal pursuant to part 4 of this title.

Therefore, rather than expressly requiring it, § 3165.4 provides an option for administrative appeal to the IBLA of BLM decisions.

Importantly, decisions appealed to the IBLA are not automatically rendered inoperative during the appeal; rather, an aggrieved party must affirmatively "request a stay and make a compelling threshold showing to justify the stay." 43 C.F.R. § 4.21(b). Consequently, this statute vests discretion in the IBLA regarding whether to stay an appealed decision.

■ Because the appeal regulations do not require administrative appeal or automatically stay a decision pending appeal, the Plaintiffs are not required to exhaust administrative remedies prior to seeking judicial review. *Northern Plains Res. Council v. BLM*, 2003 WL 23157772 (D.Mont. Dec.10, 2003); *San Juan Citizens' Alliance v. Babbitt*, 228 F.Supp.2d 1224 (D.Colo.2002); *see also Darby*, 509 U.S. at 154, 113 S.Ct. 2539. Defendants' Motion for Summary Judgment for failure to exhaust administrative remedies is denied.

### 2. Laches

Defendants also ask this Court to apply laches to bar the Plaintiffs' claims. In support of their laches argument, Defendants contend that (1) Plaintiffs participated in the 1988 RMP/EIS comment process and did not challenge oil & gas leasing in the area at that time; (2) Plaintiffs did not attempt to get on the mailing lists for lease sales so that they could timely participate in the administrative process; and (3) Plaintiffs failed to participate in the September 1999 lease sale administrative process. Plaintiffs contend that they have been actively involved in BLM oil and gas leasing programs, and that BLM did not publicly announce the sale of the Bullwacker leases until November 15, 1999, although the leases were auctioned on September 28, 1999. Moreover, they contend BLM never publicly announced its 1999 approval of the pipeline right-of-way, although it held a series of public meetings during the summer and fall of 1999 regarding the proposed protection of the Upper Missouri Breaks. Affidavit of Daniel Bennett, Mark Good, & Dyrck Van Hyning (filed Oct. 4, 2000), Tab I, Plaintiffs' Facts.

■ The finding of laches is soundly within the discretion of the trial court. *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774, 779 (9th Cir.1980). To demonstrate laches, a party must establish (1) lack of diligence by the party against whom the defense is asserted, *and* (2) prejudice to the party asserting the defense. *Apache Survival Coalition v. U.S.*, 21 F.3d 895, 905 (9th Cir.1994) (holding tribal claim under NHPA barred by laches).

■ Laches is invoked sparingly in environmental cases in the Ninth Circuit. *Portland Audubon Soc. v. Lujan*, 884 F.2d 1233, 1241 (9th Cir.1989) (citing *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 854 (9th Cir.1982)); *City of Davis v. Coleman*, 521 F.2d 661, 678 (9th Cir.1975). Two reasons underlie this policy: First, that "citizens have a right to assume that federal officials will comply with applicable law." *Preservation Coalition*, 667 F.2d at 854; *Cady v. Morton*, 527 F.2d 786, 793 (9th Cir.1975) (expressing concern with creating incentives for agency noncompliance (quoting *Minnesota PIRG v. Butz*, 498 F.2d 1314, 1324 (8th Cir.1974))); *City of Davis v. Coleman*, 521 F.2d 661, 678 (9th Cir.1975) ("It is up to the agency, not the public, to ensure compliance with NEPA in the first instance."). Second, because "ordinarily the plaintiff will not be the only victim of alleged environmental damage," and "[a] less grudging applica-

tion of the doctrine might defeat Congress' environmental policy." *Apache Survival I,* 21 F.3d at 905–06 (citing *Portland Audubon Soc'y,* 884 F.2d at 1241 (quoting *Preservation Coalition,* 667 F.2d at 854)).

The factors to consider in determining diligence are (1) whether the party attempted to communicate its position to the agency before filing suit, (2) the nature of the agency response, and (3) the extent of actions, such as preparatory construction, that tend to motivate citizens to investigate legal bases for challenging an agency action. *Coalition for Canyon Preservation,* 632 F.2d at 779 (citing *City of Davis,* 521 F.2d at 673).

The *Apache Survival Coalition* cases were brought by the San Carlos Apache Tribe regarding construction of several large telescopes in Arizona. *Apache Survival Coalition v. United States,* 21 F.3d 895 (9th Cir.1994) ("*Apache Survival I* "); *Apache Survival Coalition v. U.S.,* 118 F.3d 663 (9th Cir.1997) ("*Apache Survival II* "). In the first case, laches was used to bar plaintiffs' NHPA claim. The *Apache Survival* cases were part of a string of cases brought by other plaintiffs challenging this same project. *See Mt. Graham Red Squirrel v. Yeutter,* 930 F.2d 703 (9th Cir.1991) ("*Red Squirrel I* "); *Mt. Graham Red Squirrel v. Madigan,* 954 F.2d 1441 (9th Cir.1992) ("*Red Squirrel II* "); *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568 (9th Cir.1993) ("*Red Squirrel III* "); *Mt. Graham Coalition v. Thomas,* 53 F.3d 970 (9th Cir.1995) ("*Mt. Graham I* "); *Mt. Graham Coalition v. Thomas,* 89 F.3d 554 (9th Cir.1996) ("*Mt. Graham II* ").

The facts of *Apache Survival* indicate the extent to which an environmental plaintiff has to sleep on its rights before laches will be applies. The federal agencies in *Apache Survival* conducted extensive environmental review and made considerable efforts to consult with all affected tribes in the area. Even after the Tribe asked to be removed from the EIS mailing list, the Forest Service kept the Tribe on it. It sent the Tribe a copy of both the DEIS and the FEIS. 21 F.3d at 899–900. The Tribe offered no comments.

Two years after the administrative record was closed, and 18 months after the Record of Decision was published, the *Apache Survival* plaintiffs wrote the Forest Service indicating that areas of religious significance would be affected by the project and asking that construction be halted. The Forest Service responded by asking for more details. The Tribe did not provide them, but once again demanded that construction be stopped. The Forest Service then requested a meeting; again, the Tribe did not respond. Instead, it filed suit. *Id.* at 900. The court held the Tribe's NHPA claim was barred by laches.

Thus, what *Apache Survival I* teaches is that laches may be applied in environmental cases when the record demonstrates that the agency made consistent, repeated attempts to notify and consult with individuals affected by the project, and those individuals ignored those overtures.

Here, the challenged actions were taken in the fall of 1999. BLM made no effort to contact interested individuals other than placing notices of the lease sales in its district offices, and on the Internet. BLM does not dispute that it held meetings on July 1, 1999, and August 10, 1999, to solicit public comment on plans to protect the Upper Missouri Breaks and did not mention its intention to offer 172 parcels for lease in the area. Affidavit of Daniel Bennett, Mark Good, and Dyryck Van Hyning, Plaintiffs' Facts, Tab I (filed Oct. 4, 2000), ¶¶ 7, 9. Moreover, it does not dispute that it never circulated the pipeline

right-of-way EA for public comment. An agency's legally deficient minimalism does not provide a reason to condone the laches defense.

BLM instead alleges that Plaintiff failed to voice its concerns during the West Hi-Line RMP/EIS process. Plaintiff MWA did comment on the West HiLine RMP/EIS. Exh. D, at 130. However, its comments tracked the outline of the EIS and did not include any comments on impacts from oil and gas development other than in the Sweet Grass Hills. As noted earlier, the RMP/EIS specifically stated that oil and gas management was previously addressed in the 1981 EA, and was not analyzed in the RMP/EIS. Exh. D, at 4, 7. Thus, the lack of comment on that issue cannot operate against Plaintiffs. Moreover, Appendix 1.3, which contains a discussion of oil and gas leasing, was not available for public comment during the EIS process.

Lack of diligence is not what prevented Plaintiffs, or anyone else, from commenting on oil and gas development during the public comment period of the West HiLine RMP/EIS. The RMP/EIS scoping process identified five issues for analysis in that document; oil and gas management was not one of them. Moreover, the RMP/EIS pointed to the 1981 Oil and Gas EA as the document that made all decisions regarding oil and gas management. BLM cannot now say that oil and gas decisions were made in the RMP/EIS.

The facts of this case do not rise to the level of *Apache Survival I*. Plaintiffs have been actively involved in oil and gas issues in the Upper Missouri. They commented on relevant NEPA documents that were open to comment, and they attended meetings held by BLM. The only thing it appears they could have done was request to be put on the mailing list for lease sale notices. However, in *Apache Survival I*, the agency actively reached out to affected groups and individuals; it did not withhold information by filing it away and refusing to disclose it until specifically requested.

Thus, BLM cannot establish a lack of diligence on the part of Plaintiffs. Moreover, BLM has not demonstrated prejudice. Defendants' motion for summary judgment on the ground of laches is therefore DENIED.

### 3. Mootness

Plaintiffs have asked for the 1999 pipeline to be removed. BLM contends that the arguments raised by the Plaintiff regarding the pipeline and the right-of-way are moot on the grounds that the pipeline has already been built and is transporting gas and, consequently, any environmental review would be redundant. The "gotcha" argument is of no avail here.

■ BLM contends that an action is moot when the issues presented are no longer live and the parties lack a legally cognizable interest for which the courts can grant a remedy. *Murphy v. Hunt,* 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982); *West v. Secretary of the Dept. of Transp.,* 206 F.3d 920, 924 (2000). Generally, "the burden of demonstrating mootness is a heavy one." *Cantrell v. City of Long Beach,* 241 F.3d 674, 678 (9th Cir.2001). In *Cantrell,* the court stated that the question of mootness did not turn on whether the precise relief sought was still available, but whether there could be any effective relief. *Id.* (quoting *Northwest Environmental Defense Center v. Gordon,* 849 F.2d 1241, 1244–45 (9th Cir.1988)). Further, the *Cantrell* court noted that NEPA cases have "repeatedly emphasized that if the completion of the action challenged under NEPA is sufficient to render cases nonjusticiable, entities could merely ignore the

requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine. Such a result is not acceptable." *Id.* (citing *West v. D.O.T.,* 206 F.3d 920, 925 (9th Cir.2000)).

 In this case, although the 1999 pipeline has already been constructed and currently in use, it can be removed or shut down. Consequently, BLM's Motion for Summary Judgment as to the 1999 pipeline on mootness is DENIED.

### 4. *Statute of Limitations*

Defendants raised two statute of limitations arguments at oral argument. First, they argued that the Mineral Lands Leasing Act (MLLA), 30 U.S.C. § 226-2, provides for a ninety-day period of time to challenge leases, and that Plaintiffs did not raise this challenge until five months after the leases were sold. Second, they cited the general six-year statute of limitations in federal law to argue that Plaintiffs cannot attack the 1981 EA or the 1988 West HiLine RMP/EIS because those documents were prepared more than six years ago. Neither statute operates to bar Plaintiffs' claims.

### a. *90-Day Statute of Limitations Under the MLLA*

The MLLA states that, "No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter." 30 U.S.C. § 226-2. Other courts addressing this issue have concluded that the statute applies only when a plaintiff is alleging failure to comply with the Mineral Leasing Act; challenges that an agency failed to comply with NEPA are not governed by any specific limitations period. *Park County Res. Council, Inc. v. U.S.*

*Dep't of Agric.,* 817 F.2d 609 (10th Cir. 1987), *overruled on other grounds, Village of Los Ranchos De Albuquerque v. Marsh,* 956 F.2d 970 (10th Cir.1992); *Jones v. Gordon,* 792 F.2d 821 (9th Cir.1986) (applying similar reasoning to the Marine Mammal Protection Act); *Aulston v. U.S.,* 915 F.2d 584, 588 (10th Cir.1990). As noted by the *Park County* court, applying individual statutes' time limitations to NEPA challenges would undermine NEPA's purpose of protecting the human environment from federal action. 817 F.2d at 616–17.

 Plaintiffs were not required to file suit within 90 days of the lease sales unless they were bringing a claim under the MLLA. Because their suit brings claims under other statutes, the MLLA statute of limitations does not apply, and Defendants' motion is DENIED.

### b. *Six-Year Statute of Limitations*

 The second issue raised by Defendants is whether the Plaintiffs are barred from challenging the Lewistown District Oil & Gas EA, prepared in 1981, or the West HiLine Resource Management Plan EIS, prepared in 1988. NEPA does not contain a statute of limitations. Nor does the Administrative Procedure Act (Act), 5 U.S.C. §§ 701–706, which provides for judicial review of agency actions taken under NEPA. However, 28 U.S.C. § 2401(a) has been held to apply to actions brought under the APA. *Sierra Club v. Penfold,* 857 F.2d 1307, 1315 (9th Cir.1988). The final agency actions that are being challenged herein are the sale of three oil and gas leases in September 1999, and the grant of the pipeline right-of-way to Macum in November 1999. Both of those actions are well within the six-year statute period.

It is important to note that Plaintiffs' challenges to those final agency actions are

premised on challenges to the underlying NEPA documents. In other words, the issue before the Court is whether the existing NEPA documents were sufficient to support the actions that were taken under them. NEPA serves a dual purpose: to ensure informed decisionmaking by agency *and* to allow the public to play a role in the agency's decisionmaking process and the implementation of the decision. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). In analyzing whether an EIS or an EA suffices under NEPA, therefore, the court will look to the substance of those documents to determine whether they took the requisite "hard look" at environmental consequences, as well as the extent to which the public was able to participate in the process. This inquiry is not limited by a statute of limitations as long as the final agency action that requires the NEPA process is within that period.

Defendants' motion for summary judgment on the six-year statute of limitations is therefore DENIED.

## B. NEPA Violations

### 1. *Standard of Review*

The Administrative Procedure Act governs judicial review of agency decisions under NEPA. NEPA aims to promote environmentally sensitive governmental decision-making, without prescribing substantive standards. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 353, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *Tillamook County v. U.S. Army Corps of Eng'rs,* 288 F.3d 1140, 1143 (9th Cir.2002). Toward that end, the Congress by statute requires, with some exceptions, that all federal agencies consider the environmental impact of their actions. *Anderson v. Evans,* 350 F.3d 815, 829(9th Cir.2003).

The adequacy of an Environmental Impact Statement (EIS) is judged by whether it constituted a "detailed statement" that took a "hard look" at all of the potentially significant environmental consequences of the proposed action and reasonable alternatives thereto, considering all relevant matters of environmental concern. 42 U.S.C. § 4332(2)(a); *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); 40 C.F.R. § 1502.1. The critical question is whether the EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the proposed action as well as a range of alternatives to that action. *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982). The "hard look" mandated by Congress must be timely, and must be taken objectively and in good faith-"not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Metcalf v. Daley,* 214 F.3d 1135, 1142 (9th Cir.2000).

In reviewing the adequacy of an EIS, "[t]his circuit employs a 'rule of reason' that asks whether an EIS contains a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences.'" *Idaho Cons.League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir. 1992). "The rule of reason analysis and the review for an abuse of discretion are essentially the same." *Neighbors of Cuddy Mountain v. U.S. Forest Svc.,* 137 F.3d 1372, 1376 (9th Cir.1998). "An environmental impact statement is more than a disclosure document." 40 C.F.R. § 1502.1. It is not enough to simply outline the foreseeable effects of a decision already made. NEPA requires consideration of a range of alternatives, and frank public discussion of those alternatives.

Similar rules apply to Environmental Assessments (EA). An EA is to

"[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact," and "shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(e), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(a)(1), (b); *Save the Yaak Comm. v. Block,* 840 F.2d 714, 717–18 (9th Cir. 1988). Although the discussions may be "brief," the Court must still determine whether an EA took a " 'hard look' at the environmental consequences" of the proposed action. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211 (9th Cir.1998) (citing *Oregon Natural Res. Council v. Lowe,* 109 F.3d 521, 526 (9th Cir.1997)). The court must defer to an agency conclusion that is "fully informed and well-considered," but need not rubber stamp a "clear error of judgment." *Blue Mountains,* 161 F.3d at 1211 (quoting *Save the Yaak Comm.,* 840 F.2d at 717 and *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851).

An EA as well as an EIS must analyze "connected actions." *Save the Yaak,* 840 F.2d at 720. An EA must discuss reasonably foreseeable future actions that may result in cumulative impacts. *Id.* It must also be circulated to the public for some level of comment and participation. *Citizens for Better Forestry v. U.S. Dept. of Agriculture,* 341 F.3d 961, 970–971 (9th Cir.2003). As the Ninth Circuit recently noted:

> Although we have not established a minimum level of public comment and participation required by the regulations governing the EA and FONSI process, we clearly have held that the regulations at issue must mean something. ... It is evident, therefore, that a complete failure to involve or even inform the

public about an agency's preparation of an EA and a FONSI, as was the case here, violates these regulations.

*Id.* In this circuit, the "touchstone [of NEPA compliance] is whether an [EA's] selection and discussion of alternatives fosters informed decision-making and informed public participation." *California v. Block,* 690 F.2d 753, 767 (9th Cir.1982), *quoted in Natural Resources Defense Council, Inc. v. National Marine Fisheries Svc.,* 280 F.Supp.2d 1007, 1015 (N.D.Cal.2003).

If the EA establishes that the agency's action *"may* have a significant effect upon the ... environment, an EIS must be prepared." *Foundation for N. Am. Wild Sheep v. United States Dep't of Agric.,* 681 F.2d 1172, 1178 (9th Cir.1982) (emphasis added); *see also Blue Mountains,* 161 F.3d at 1212. If not, the agency must issue a Finding of No Significant Impact (FONSI), *see Blue Mountains,* 161 F.3d at 1212; 40 C.F.R. §§ 1501.4, 1508.9, accompanied by " 'a convincing statement of reasons' to explain why a project's impacts are insignificant." *Blue Mountains,* 161 F.3d at 1212 (quoting *Save the Yaak Comm.,* 840 F.2d at 717); *National Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 730 (9th Cir.2001).

Whether there may be a significant effect on the environment requires consideration of "context and intensity." 40 C.F.R. § 1508.27; 42 U.S.C. § 4332(2)(a); *see also Sierra Club v. U.S. Forest Svc.,* 843 F.2d 1190, 1193 (9th Cir. 1988). Context refers to the scope of the agency's action, including the interests affected. Intensity relates to the degree to which the agency action affects the locale and interests identified in the context part of the inquiry. *National Parks & Conservation Ass'n,* 241 F.3d at 731.

In challenges to an agency's issuance of a FONSI, the reviewing court must ensure that, in preparing the EA, the agency took a "hard look" at all the relevant foreseeable consequences of a proposed action, in light of their context and intensity, and determined that no "significant impact" to the environment would result. *Metcalf*, 214 F.3d at 1141 (citing *Robertson*, 490 U.S. at 348, 109 S.Ct. 1835). An agency's issuance of a FONSI is entitled to "substantial deference." *Oregon Natural Res. Council*, 490 U.S. at 372, 109 S.Ct. 1851. The agency's determination is considered in light of the degree of uncertainty manifested, and the degree of controversy generated. "Either of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." *National Parks & Conservation Ass'n*, 241 F.3d at 731 (quoting *Sierra Club v. U.S. Forest Svc.*, 843 F.2d 1190, 1193, 1194 (9th Cir.1988); *Blue Mountains*, 161 F.3d at 1212–14).

### 2. Oil and Gas Lease Sales

The sale of oil and gas leases is an irretrievable commitment of resources for which an EIS must be prepared. *Conner v. Burford*, 848 F.2d 1441 (9th Cir.1988); *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1227 (9th Cir.1988). The government notes that the Tenth Circuit has held that an EIS is not required at the lease sale stage. *Park County Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609 (10th Cir.1987). However, that is not the rule in this Circuit, nor has it been the rule for the past 15 years. As long as the leases are non-NSO (non-no-surface-occupancy) leases, which these are, their sale constitutes an irretrievable commitment of resources. *Conner*, 848 F.2d at 1451 ("the government must complete an EIS before it makes an irretrievable commitment of resources by selling non-NSO leases").

While it is true that some or all of the environmental consequences of oil and gas development may be mitigated through lease stipulations, it is equally true that the purpose of NEPA is to examine the foreseeable environmental consequences of a range of alternatives *prior* to taking an action that cannot be undone. *Conner*, 848 F.2d at 1446 ("The purpose of an EIS is to apprise decision makers of the disruptive environmental effects that may flow from their decisions at a time when they retain a maximum range of options"); 40 C.F.R. § 1501.2.

Thus, I need not determine whether an EIS was required prior to the sale of the three leases; *Conner* establishes that it was. Instead, the question is whether the West HiLine RMP/EIS fulfilled the BLM's obligations under NEPA; that is, whether it took a "hard look" at the foreseeable environmental consequences of oil and gas development on these leaseholds.

Although the government contends that "[t]o say that [the West HiLine RMP/EIS] is not an oil and gas EIS is to ignore the substance of the document," Govt. Brief at 18, the text of the RMP/EIS belies that statement. The government made clear in the RMP/EIS that oil and gas management was *not* being analyzed in that document. *See* Exh. D, at 4, 7.

The explanation of the no-action alternative in the RMP/EIS Record of Decision (ROD) verifies that oil and gas development was never analyzed in the RMP/EIS: "This [no-action] alternative plus the guidance given in the Management Common to All Alternatives would have formed the RMP." ROD, Exh. C, Tab 1 (Sept.1988), at 3. In other words, oil and gas management would have been the same even if the no-action alternative had been chosen. Given that the oil and gas outcome was established from the beginning, BLM cannot

reasonably contend that it was subject to any level of NEPA analysis in this document. This was essentially a "no look" not a "hard look" process.

Appendix 1.3 does not transform the RMP/EIS into an oil and gas EIS. As noted, NEPA requires more than disclosure of the consequences of a decision already made. Appendix 1.3 discusses in some detail the potential impacts of oil and gas leasing on a variety of resources. But keeping in mind the "dual purpose" of NEPA, Appendix 1.3 cannot satisfy BLM's NEPA obligations with respect to oil and gas development. It was added to the EIS *after* the public comment period closed. It contains no discussion of alternatives; instead, it is based on the assumption that oil and gas leasing will take place. Finally, it is included in a document that states up front that oil and gas management is not being analyzed.

The only way the West HiLine RMP/EIS could support the lease sales herein is by "tiering" to the 1981 Lewistown Oil and Gas EA, which in turn would have to be sufficient to fulfill BLM's NEPA obligations. Apart from the fact that tiering proceeds from the programmatic stage to the site-specific stage and not vice versa, 40 C.F.R. § 1502.20, as previously noted, an EIS must be prepared prior to the sale of oil and gas leases. *Conner* addressed just this situation: the agency prepared an EA, and the Ninth Circuit held that was insufficient. The rule from *Conner* cannot be fulfilled by an EIS that merely refers the reader to an earlier prepared EA.

It is also unclear from the record whether the 1981 EA was subject to public comment or discussion. The document contains no mention of public meetings, nor any comments from the public with responses by the agency, as is required of an EIS. While the public notice requirements for an EA are not as stringent as those for an EIS, it would certainly thwart one of the cornerstones of NEPA to allow an EIS to "tier" to an EA that was never circulated for public comment.

Finally, the BLM never issued a Finding of No Significant Impact (FONSI) for the 1981 Oil and Gas EA. The document to which the parties have referred as a FONSI is a finding of no major federal action, issued two years before the EA was completed. This is not a FONSI. Thus, the BLM did not fulfill its duties under 40 C.F.R. § 1508.9.

Therefore, neither the West HiLine RMP/EIS nor the 1981 EA can support the BLM's sale of the oil and gas leases herein. Because BLM did not fulfill its obligations under NEPA, Plaintiffs' motion for summary judgment under NEPA is granted with respect to the three leases.

### 3. Pipeline Right–of–Way

▬ BLM prepared an EA for the pipeline right-of-way, and as a result, issued a FONSI and ROD. Exh. H, Tab 3. The EA refers to the West HiLine RMP/EIS for discussions of existing resources, but contains its own discussion regarding foreseeable effects of the proposed action.

An EA must discuss those alternatives "necessary to permit a reasoned choice"; the discussion can be brief. *Natural Res. Defense Council, Inc. v. National Marine Fisheries Svc.*, 280 F.Supp.2d 1007, 1012 (N.D.Cal.2003). Nonetheless, the permitted brevity does not obviate the requirement that the EA "include brief discussions ... of the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9(b). The right-of-way EA fails that test.

For example, the impact analysis in the EA contains a section on "Hazardous or Solid Wastes," which states in its entirety:

The R/W stipulations provide for detection and safe disposal of hazardous materials and wastes. In addition, the R/W grant would include a stipulation which would indemnify the United States against any liability arising from the release of any hazardous substance or hazardous waste on the R/W.

Exh. H, Tab 3, at 8. This section implies that some hazardous or solid wastes may be released in conjunction with this project; however, no information is provided about what those wastes might be or how they might affect the environment. The fact that the right-of-way contains stipulations regarding detection and disposal of wastes does not fulfill the NEPA mandate to provide sufficient information so as to make an informed decision.

More importantly, the right-of-way EA was never circulated for public comment, nor publicized in any way. The government contends that "the CEQ regulations give the authorized officer great flexibility in determining the level of public participation and notification," citing 40 C.F.R. § 1501.4(e)(2) and 40 C.F.R. 1506.6. What the regulations actually say is that agencies shall "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a). Further, the regulations say the agency *shall* provide public notice of NEPA-related hearings, public meetings and the availability of environmental documents. 40 C.F.R. § 1506.6(b). The regulations even prescribe in detail the types of notice contemplated for actions "with effects of primarily local concern." 40 C.F.R. § 1506.6(b)(3)(I)-(ix). The list includes notice to the state, notice to tribes, publication in local newspapers, notice through other media, publication in newsletters, direct mailing, and posting of a notice in the area where the action will take place.

The government has provided no evidence that it complied in any way with this regulation. In fact, its brief simply states, "In this case, no posting occurred, although an Environmental Documentation Log was kept and is made available upon public request." Govt. Brief at 25. Admitting this is a clear violation of the law, the government continues, "However, because the pipeline challenge is moot, no purpose would be served by remanding the matter to the BLM for correction of this technical violation." *Id.* This suggests that the government views the public participation goals of NEPA as merely "technical" in nature. The Ninth Circuit takes a different view, however. In a recent case in which the Forest Service prepared an EA for a new forestwide rule and failed to publish notice of that action or solicit any public comment, the court rejected the agency's characterization of the public-notice requirements as "hortatory." *Citizens for Better Forestry v. U.S. Dept. of Agriculture,* 341 F.3d 961, 970 (9th Cir.2003). Acknowledging that an EA need not conform to all the requirements of an EIS, the court said this "does not mean that 40 C.F.R. §§ 1501.4(b) and 1506.6 are without substance." *Id.* In fact, it went on, "We have previously interpreted these regulations to mean that the public *must* be given an opportunity to comment on draft EAs and EISs." *Id.* (emphasis added).

The BLM's failure to provide any notice to the public of its intention to evaluate the environmental impacts of the pipeline right-of-way, or to solicit comments from the public regarding the potential impacts of that action, violates NEPA. Combined with the conclusory discussion of potential impacts from hazardous or solid wastes, I find that the pipeline right-of-way EA failed to accomplish that which NEPA envisioned and is insufficient to support the action taken by the BLM. It is hard to

imagine a more blatant example of an agency's failure to meet the congressional mandate to include citizens in the decision making process.

I am therefore granting Plaintiffs' motion for summary judgment on their NEPA claims for the pipeline right-of-way.

## C. Endangered Species Act

The Endangered Species Act (ESA) contains substantive and procedural provisions requiring federal agencies to ensure that their actions are not likely to jeopardize the continued existence of any endangered or threatened species. *See* 16 U.S.C. §§ 1536(a)(2). The ESA prescribes a three-step process to facilitate compliance with its substantive provisions: 1) An agency proposing an action must inquire of the U.S. Fish and Wildlife Service whether any threatened or endangered species "may be present" in the area of the proposed project. *See* 16 U.S.C. § 1536(a)(1); 2) if the answer is affirmative, the agency must prepare a "biological assessment" to determine whether such species is "likely to be affected by the action." The biological assessment may be part of the environmental assessment for the project; 3) if it is determined that the project is likely to affect listed species, formal consultation with the U.S. Fish and Wildlife Service is required. *Thomas v. Peterson,* 753 F.2d 754, 763 (9th Cir.1985).

The purpose of the biological assessment is to "evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action." 50 C.F.R. § 402.12(a); 16 U.S.C. § 1536(a)(1). If the BA determines that there will be no effect on threatened and endangered species, and FWS concurs, formal consultation is not required. 50 C.F.R. 402.12(k)(1).

The contents of a BA are discretionary, depending upon the nature of the federal action being assessed. 50 C.F.R. § 402.12(f); *Defenders of Wildlife v. Babbitt,* 130 F.Supp.2d 121, 126 n. 4 (D.D.C. 2001). The regulations suggest that a BA may include results of an on-site inspection, views of recognized experts on the species, review of the relevant literature, analysis of the effects of the action on the species and habitat and an analysis of alternative actions. 50 C.F.R. §§ 402.12(f). At least one court has held that a DEIS and FEIS taken together could be construed as a BA, even if not denominated as such. *Bays' Legal Fund v. Browner,* 828 F.Supp. 102, 110–111 n. 19–21 (D.Mass. 1993).

My inquiry under the APA is whether the BLM acted arbitrarily, capriciously, or otherwise not in accordance with the law. 5 U.S.C. § 706. "To determine whether an agency violated the arbitrary and capricious standard, this court must determine whether the agency articulated a rational connection between the facts found and the choice made." *Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife,* 273 F.3d 1229, 1236 (9th Cir.2001) (citing *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 982 (9th Cir.1985)). If "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," its action may properly be held to be arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443(1983). "This inquiry must be 'searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Marsh v. Oregon Natural Re-*

*sources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

Here, the BLM prepared a BA as part of the West HiLine RMP/EIS. Thus, BLM was aware of endangered or threatened species that are present in the planning area. BLM concluded in its BA that the activities envisioned by the RMP/EIS were not likely to affect any threatened or endangered species. Exh. D, Appendix 4.2. The U.S. Fish & Wildlife Service (FWS) reviewed the BA and concurred in BLM's no-effect determination. Govt. Brief at 27, Attachment 6. Specifically, FWS stated:

> We concur with your determination that the preferred alternative will not affect the bald eagle .... peregrine falcon ... black-footed ferret .... or the piping plover.

Attachment # 6 to Govt. Brief, ¶ 1.

██ The BLM relies on its BA, and FWS's concurrence, as evidence of its compliance with the ESA for the leasing and pipeline decisions. The issue is whether the West HiLine RMP/EIS sufficiently considered oil and gas development to contemplate possible effects on threatened or endangered species from the sale of the leases herein. The BA and FWS's concurrence contemplated a particular proposed action, which was determined not to have an effect on threatened or endangered species. The question is: what was the nature of the proposed action?

As already discussed, the RMP/EIS was not an oil and gas document. However, Appendix 1.3 predicts in some detail possible impacts of oil and gas development on a variety of resources. A BA based upon that proposed action might suffice under the ESA. Unfortunately, the BA and FWS's concurrence were premised on the Draft EIS, which did not include Appendix 1.3. FEIS, Exh. D, at ix; DEIS, Exh. E.

Moreover, the BA addresses possible impacts from the Management Common to All Alternatives (which included oil and gas development) by listing six guidelines "to manage other actions taken on BLM administered lands such as ... oil and gas development." FEIS, Exh. D, at A–83. These guidelines are no more than a sentence or two each: 1) BLM will maintain and enhance species for all species of wildlife; 2) no action will be taken that will jeopardize and federally listed species; 3) BLM will work with FWS on species reintroduction; 4) BLM will consult with FWS when any action may affect a threatened or endangered species; 5) BLM may require 1/4– to 3–mile zone around surface uses to protect essential habitat of threatened or endangered species; and 6) BLM will adhere to peregrine falcon recovery plan and guidance from Montana Peregrine Falcon Working Group. Exh. D, A–83—A–84.

BLM is merely reciting duties already required of it in these guidelines. These are not facts, they are conclusions; they are not descriptive, they are speculative. They reveal nothing about whether or how specific species or their habitat may be affected by oil and gas development. Instead, they simply postpone that determination to some point in the future.

While it is true that the court in *Conner* addressed a Biological Opinion rather than a Biological Assessment, the fundamental teaching of that case is true in either situation: the relevant agency action for purposes of the ESA "entails not only leasing but leasing and all post-leasing activities through production and abandonment." 848 F.2d at 1453. Prior to selling oil and gas leases, the ESA requires the agency to assess the potential effects of

the action on threatened or endangered species. 50 C.F.R. § 402.12(a). According to the Ninth Circuit, when the action is the sale of oil and gas leases, the scope of the action includes activities from leasing through post-production and abandonment. *Conner*, 848 F.2d at 1453. Thus, the issue is whether BLM has fulfilled that obligation.

It has not. The West HiLine RMP/EIS BA contains no analysis of the effects of oil and gas production on any species. In regards to oil and gas management, it simply states that BLM will follow the law. Even if the BA is sufficient for the five management issues analyzed in the RMP/EIS, it is insufficient as an assessment of impacts from oil and gas development on threatened or endangered species.

Thus, BLM may not rely on that BA to fulfill its pre-leasing obligations under the ESA. Plaintiffs' motion for summary judgment on this issue is granted.

## D. National Historic Preservation Act

The National Historic Preservation Act (NHPA) has been characterized as a "stop, look and listen" provision. *Apache Survival I*, 21 F.3d at 906; *Muckleshoot Indian Tribe v. U.S. Forest Svc.*, 177 F.3d 800, 805 (9th Cir.1999). NHPA requires, prior to any federal undertaking, that the relevant federal agency "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" and "afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with

regard to such undertaking." 16 U.S.C. § 470f.[2]

NHPA requires a federal agency to make a reasonable and good faith effort to identify historic properties, 36 C.F.R. § 800.4(b); determine whether identified properties are eligible for listing on the National Register based on criteria in 36 C.F.R. § 60.4; assess the effects of an "undertaking" on any eligible historic properties found, 36 C.F.R. §§ 800.4, 800.5, 800.9(a); determine whether the effect will be adverse, 36 C.F.R. §§ 800.5, 800.9(b); and avoid or mitigate any adverse effects, 36 C.F.R. §§ 800.8(e), 800.9.

Additional NHPA provisions apply to Indian tribes: In carrying out its responsibilities under Section 106, a Federal Agency shall consult with any Indian Tribe ... that attaches religious and cultural significance to properties described in Subparagraph (A).

16 U.S.C. § 470a(d)(6)(B).

### 1. Standing

▮▮▮▮ Defendants claim Plaintiff Curly Youpee does not have standing to bring this claim. To satisfy Article III, which is the irreducible constitutional minimum of standing, a plaintiff must demonstrate that he has suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Svcs.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). A

**2.** "The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take

into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under part B of this subchapter a reasonable opportunity to comment with regard to such undertaking." 16 U.S.C. 470f (2000).

plaintiff bringing suit under the APA for a violation of a particular statute must also show that his injury falls within the "zone of interests" the statute was designed to protect. *Douglas County v. Babbitt,* 48 F.3d 1495, 1499 (9th Cir.1995); *Cantrell v. City of Long Beach,* 241 F.3d 674, 679 (9th Cir.2001).

To satisfy the injury in fact requirement, a plaintiff asserting a procedural injury must show that "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573 n. 8, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Cantrell,* 241 F.3d at 679. Additionally, where plaintiffs validly assert a procedural injury, they need not meet "the normal standards for redressability and immediacy." *Lujan,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130.

The zone of interests test consists of a two part inquiry: first, determining which interests the statute protects and second, determining whether the agency action affects those interests. *TAP Pharm. v. U.S. Dep't of Health and Human Svcs.,* 163 F.3d 199, 203 (4th Cir. 1998). The purpose of the NHPA is to remedy the dilemma that "historic properties significant to the Nation's heritage are being lost or substantially altered, often inadvertently, with increasing frequency." 16 U.S.C. § 470(b)(3). The Act prescribes the section 470f process, which requires federal agencies with the authority to license an undertaking "to take into account the effect of the undertaking on any ... site ... that is ... eligible for inclusion in the National Register" prior to issuing the license. 16 U.S.C. § 470f.

Here, Plaintiff claims BLM failed to make a reasonable effort to identify historic sites that may be affected by the oil and gas lease sales and failed to consult with Rocky Boys and Fort Belknap Indian Reservations before issuing the leases and the right-of-way. Defendant first argues Youpee is a member of the Fort Peck Tribe, not the Rocky Boys or Fort Belknap tribes. In response, Youpee filed an affidavit stating that "The Missouri Breaks is well-documented and officially recognized as a traditional migratory route of my people." Youpee Affidavit, Plaintiffs' Reply Brief, Tab G, ¶ 4. Moreover, Youpee avers:

> I have personally visited sites of traditional cultural significance to me people in the Upper Missouri River breaks, and the area encompassed by the lawsuit, as a traditional cultural undertaking. I will do so again each year in the future.

*Id.* ¶ 4. Youpee further testifies that BLM's failure to follow the procedures established by NEPA and NHPA have deprived him of his "voice and input." *Id.* ¶ 5. He is right.

NHPA's regulations require federal agencies to provide interested members of the public reasonable opportunity to participate in the section 470f process. 36 C.F.R. §§ 800.1(a), 800.2(a)(4), (d)(1). Thus, any member of the public who can demonstrate sufficient interest in the preservation of the historical lands at issue falls within the zone of interests protected by the NHPA.

Youpee has sufficiently alleged facts supporting his standing under Article III as well as the zone of interests protected by the NHPA.

### 2. Merits

In defense of its failure to initiate any section 470f process prior to selling the leases herein, BLM contends that the lease sales were not "undertakings," and therefore did not trigger any obligation on its part to conduct site inventories or con-

sult with any tribes. It does acknowledge that the pipeline right-of-way grant was an "undertaking," but contends that it met its NHPA obligations by conducting a cultural resource inventory, which showed the project would have no effect on historic sites. Each of these arguments is examined in turn.

### a. Lease Sales

 BLM states, without citation, that a lease sale is not an "undertaking." It explains that conclusion by stating, "A lease sale is not the point at which the agency decision has the potential to affect historic properties." Govt. Brief at 31. That is not the point at which the statute requires identification or consultation, however. The relevant regulations define undertaking as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; those requiring a Federal permit, license or approval; and those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency." 36 C.F.R. § 800.16(y). The sale of oil and gas leases is a "project, activity or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency," and may also be construed as a activity "requiring a Federal permit, license or approval."

Initiation of the section 407f (also referred to as section 106) process involves two steps. According to the regulations, "The agency official shall determine whether the proposed Federal action is an undertaking as defined in §§ 800.16(y) and, if so, whether it is a type of activity that has the potential to cause effects on historic properties." 36 C.F.R. § 800.3(a). An undertaking has an "effect" when the

undertaking "may alter characteristics of the property that may qualify the property for inclusion in the National Register ... [including] alteration to features of a property's location, setting, or use...." 36 C.F.R. § 800.5(a)(1). An "effect" is "adverse" when it may "diminish the integrity of the property's location, ... setting ..., feeling, or association." *Id.* Examples of "adverse effects" include physical destruction, the introduction of visual, audible, or atmospheric elements that are out of character with the property or alter its setting, and "[t]ransfer, *lease*, or sale of property out of Federal ownership or control without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance." *Id.* (emphasis added).

This regulatory definition of "adverse effects" suggests that the sale of oil and gas leases is considered an undertaking. The BLM recognizes this by arguing that it uses lease stipulations to avoid those effects. But it cannot skip the first step and go directly to the second. If the lease sales are an undertaking, BLM is required to initiate the NHPA process in accordance with the regulations.

BLM's contention that the sale of oil and gas leases is not an undertaking is not supported by the statute or the regulations. In fact, BLM's argument on this point mirrors its NEPA argument: By placing stipulations on leases, the agency can avoid affecting historic properties. But like NEPA, NHPA is a procedural statute. The process of identifying properties and consulting with affected tribes as well as members of the public is the goal sought by the statute. Lease stipulations do not accomplish the same goal, and cannot replace the BLM's duties under NHPA. Moreover, it is conceivable that different lease stipulations would evolve from a larger discussion of possible effects

on historic tribal lands from oil and gas leasing. It seems to me that agency efforts to comply with the law are more productive than efforts that appear to be directed at circumventing the law.

The plain language of NHPA requires consultation once an agency embarks on an undertaking. The sale of oil and gas leases is an undertaking. I am therefore granting Plaintiffs' motion for summary judgment that BLM violated NHPA by failing to follow the prescribed NHPA process prior to selling the leases herein.

### b. Pipeline Right–of–Way

■ BLM acknowledges that the right-of-way grant was an "undertaking." It performed a cultural resource inventory in order to identify historic sites that could be affected by the pipeline. Exh. H., Tabs 5, 7. It does not explain the fact that the report was not sent to it until November 5, 1999, a day after the right-of-way grant was issued.

The cultural resources survey reported one archaeological site "very near the project area." Exh. H, Tab 5, at 3. The site, a stone tipi ring used by Native Americans, was outside the proposed right-of-way-a fact relied upon by BLM in justifying its failure to take any other action under NHPA. But the site is only 54 feet away from the pipeline route. Exh. H., Tab 5, at 3. BLM is obligated to consider the "affected area," not just the narrow area where the pipeline is laid. *See, e.g., Colorado River Indian Tribes v. Marsh*, 605 F.Supp. 1425, 1438 (D.Cal.1985). Moreover, tribes known to have used the area should have been consulted to determine whether they had a different view of potential adverse effects.

According to the regulations, once an historic property has been identified, the agency shall "[s]eek information, as appropriate, from consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area, and identify issues relating to the undertaking's potential effects on historic properties." 36 C.F.R. § 800.4(a)(3). Consulting parties are defined as including Indian tribes, 36 C.F.R. § 800.2(c)(2), as well as the public. 36 C.F.R. § 880.2(d) ("The agency official shall seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties, the likely interest of the public in the effects on historic properties...."). In other words, the regulations provide direct guidance to an agency engaged in an undertaking to consult with tribes and with the public.

The record does not reflect any such consultation. In fact, the only consultation referred to by BLM in its brief is consultation on the West HiLine RMP/EIS. Given the nature of that document, which did not analyze site-specific impacts, and the nature of the undertaking at issue, which did have potential impacts on a specific site, that consultation is insufficient to fulfill BLM's obligations under NHPA.

Because BLM failed to consult after identifying an historic site in the area of the pipeline right-of-way, it violated NHPA. Plaintiffs' motion for summary judgment on this issue is granted.

### V. REMEDY

Having found the BLM in violation of NEPA, the ESA, and the NHPA in its sale of the three leases to Macum and its grant of the pipeline right-of-way to Macum, it is necessary to determine the appropriate remedy.

Plaintiffs contend that the West HiLine EIS must be set aside and all oil and gas development dependent on that document enjoined. This would include the three

Bullwacker leases and the pipeline right-of-way as well as all pending and future oil and gas development activities in the area covered by the EIS. Further, during the pendency of the injunction, Plaintiffs ask that BLM be ordered to comply with its statutory duties. Specifically, they ask that BLM be ordered to:

(1) Prepare a valid EIS as to the oil and gas leasing program for North Central Montana;

(2) Prepare valid pipeline right-of-way EAs;

(3) Prepare a valid biological assessment of the oil and gas leasing program in North Central Montana, including a preparation of a comprehensive inventory of all threatened and endangered species; and

(4) Consult with all required entities, reaching out to nearby tribes, as required by NHPA.

Plaintiffs also request attorneys' fees and costs under EAJA.

BLM contends that the remedies requested by Plaintiffs are drastic. Rather, it asks this Court to "allow the agency additional opportunity to investigate, explain, and inform the public—in other words, correct the decision making process. Rescission of the leases and right-of-way may be unnecessary if, following remand, the BLM's decision making processes result in similar decisions." Govt. Brief at 36.

Macum Energy contends the Court does not have jurisdiction over any leases other than those addressed by this suit, and cannot extend an injunction beyond those leases.

## A. Scope of Injunctive Relief

 "The proper remedy for substantial procedural violations of NEPA and the ESA is an injunction." *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1230 (9th Cir.1988). The traditional bases for injunctive relief are irreparable injury and inadequacy of legal remedies. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). In issuing an injunction, the court must balance the equities between the parties and give due regard to the public interest. *Idaho Watersheds Project*, 307 F.3d at 833. An injunction is never to be issued automatically without explicit balancing of the equities. *Village of Gambell*, 480 U.S. at 542, 107 S.Ct. 1396. If the question of injunctive relief raises intensely factual issues, the scope of the injunction is to be determined by the district court. *National Parks & Conservation Assn. v. Babbitt*, 241 F.3d 722, 738 (9th Cir.2001) (quoting *Alaska Wilderness Recreation & Tourism Assn. v. Morrison*, 67 F.3d 723, 732 (9th Cir.1995)).

The court's equitable powers are broad, and it is wholly within the court's authority to fashion a remedy that fits the particular facts of the case before it. Moreover, the court has the power to fashion a remedy that ensures full compliance with the law. For instance, in *Metcalf v. Daley*, in which the federal defendants approved whale hunting by the Makah tribe without fully complying with NEPA, the Ninth Circuit recognized the peril of remanding to the agency for compliance with NEPA when the government was already on the record in support of the proposed action. 214 F.3d at 1146. It considered ordering the government to proceed directly to the preparation of an EIS, since it had already once prepared a defective EA. Given that time was not of the essence in that instance, it instead ordered the agency to prepare an EA, and placed the burden of proving it was sufficient on the defendants should the issue return to the courts. *Id.*

### 1. Oil and Gas Leases

This case is close to being on all fours with *Conner v. Burford*, 848 F.2d 1441 (9th

Cir.1988) and *Bob Marshall Alliance v. Hodel,* 852 F.2d 1223 (9th Cir.1988). In both cases, the Ninth Circuit approved an injunction against all surface-disturbing activity on existing leases until preparation of an EIS and BO. *Conner,* 848 F.2d at 1461; *Bob Marshall Alliance,* 852 F.2d at 1227–28. It reasoned that it was converting non-NSO leases into NSO leases during the pendency of the injunction, and noted, "We enjoin only the actions of the government; the lessees remain free to assert whatever claims they may have against the government." 848 F.2d at 1461. It also remanded to the district court for clarification of the scope of its injunctions.

When faced with a similar violation of NEPA involving coal leasing in the Powder River Basin, Judge Battin initially voided all the leases. *Northern Cheyenne Tribe v. Hodel,* 851 F.2d 1152, 1154 (9th Cir.1988). Upon timely motion of the government to amend, however, the Court suspended rather than voided two of the three leases pending preparation of an SEIS, and allowed one mining company to continue mining until and unless the BLM found that mining was causing "significant socioeconomic impacts." *Id.* at 1154–55. Once the SEIS was completed, the BLM was ordered to decide whether to rescind the leases or impose additional measures of mitigation. *Id.* at 1155.

*Northern Cheyenne* provides some guidance on the scope of an injunction in the face of producing leases. Three coal companies purchased leases with full knowledge of the plaintiffs' lawsuit, but did not intervene until after the court ruled against the BLM. In response to the Tribe's contention that the district court should have automatically enjoined all leases without first balancing the equities, the Ninth Circuit recognized that the equitable considerations involved in deciding the

scope of an injunction are different when mining is going forward on the basis of fundamentally flawed EIS. It therefore remanded with directions to the district court to hold an evidentiary hearing and balance the equities on the record. "If the district court should determine that the threatened harm to the environment, including the cultural, social and economic cost to the Tribe, would be irreparable and that the balance of equities favors the Tribe, all mining should be stayed until the Secretary completes his review." *Id.* at 1158. The Circuit remanded with directions to correct two additional defects in the injunction: first, to order the Secretary of the Interior to comply with his own regulations, and second, to expressly prohibit the Secretary from considering the lessees' financial interests in completing the EIS. *Id.* at 1155 (citing *Cady v. Morton,* 527 F.2d 786, 798 (9th Cir.1975)).

Thus, *Conner* and *Bob Marshall Alliance* suggest the court can enjoin all surface-disturbing activity pending the BLM's compliance with NEPA and ESA, while *Northern Cheyenne* teaches that the court should hold an evidentiary hearing prior to enjoining ongoing mining, and must make explicit findings about the public interest. If the injunction can be fashioned so as to allow mining while minimizing adverse environmental impacts pending completion of the EIS, a more recent case suggests no evidentiary hearing is required. *Idaho Watersheds,* 307 F.3d 815.

In *Idaho Watersheds,* the district court imposed interim measures proposed by the BLM, which were not as drastic as those suggested by the plaintiffs (who wanted rescission of all grazing permits) or the ranchers (who wanted the status quo to be maintained while an EIS was being prepared). The court imposed the injunction without holding an evidentiary hearing-an issue that was appealed by the ranchers.

The Ninth Circuit held it was proper for the court to issue interim injunctive relief without holding an evidentiary hearing on these facts:

> Because these are interim measures designed to allow for a process to take place which will determine permanent measures, and all parties will have adequate opportunity to participate in the determination of permanent measures (and if need be challenge the outcome in court), we hold that an evidentiary hearing was not required on the facts of this case.

*Id.* at 831 (emphasis added).

■ Here, unlike in *Conner,* the lessee is a party to the case. The Court therefore has the power to void the leases as well as the right-of-way. *See Kettle Range Conservation Group v. U.S. Bureau of Land Management,* 150 F.3d 1083 (9th Cir.1998). A third party's potential financial damages from an injunction generally do not outweigh potential harm to the environment. *National Parks & Cons. Ass'n,* 241 F.3d at 738.

■ Because there is very little evidence in the record regarding Macum's leases, and because I am required to balance the equities on the record, I am going to preliminarily enjoin all surface-disturbing activity on the three leases pending an evidentiary hearing regarding the scope of injunctive relief pending completion of the appropriate environmental reviews. I am considering rescission of the three leases, which would put the Plaintiffs back in the position they were before BLM acted illegally.

### 2. Pipeline Right–of–Way

The pipeline has been laid and is in use. Removing it pending compliance with NEPA, ESA, and NHPA has the potential to cause additional harm, especially if the BLM decides to issue the right-of-way after fulfilling its statutory obligations. At the same time, allowing the status quo to continue appears to reward illegal behavior and makes it even more unlikely that a new EA will make any different finding. Courts have held that the purpose of NEPA is to make informed choices, and fashioning a remedy that restores that choice as much as possible is acceptable.

For example, the Ninth Circuit affirmed the rescission of water contracts in a case wherein the Bureau of Reclamation issued the 40–year contracts without first complying with its obligations under the ESA. *Natural Resources Defense Council v. Houston,* 146 F.3d 1118 (9th Cir.1998). It did so even though a "no-jeopardy" Biological Opinion had been issued during the pendency of the litigation. "The process, which was not observed here, itself offers valuable protections against the *risk* of a substantive violation and ensures that environmental concerns will be properly factored into the decision-making process as intended by Congress." *Id.* at 1128–29. In affirming the remedy of contract rescission, the Court stated, "Where contracts have already been entered into, the opportunity to 'choose' has been eliminated—all that remains is the limited ability to make the path chosen as palatable as possible. Therefore, an injunction would not serve any purpose if the contracts are not invalidated." *Id.* at 1129.

■ In the case of the pipeline right-of-way, a middle ground can be found pending the outcome of an evidentiary hearing. I am ordering that the pipeline be shut down without removing it from the ground. This will go a long way toward restoring "choice," will not allow Macum to reap any reward from BLM's illegal behavior, and will make it easier to restore use should the BLM make a future decision granting the right-of-way after consid-

ering potential impacts under NEPA, ESA and NHPA.

As with the leases, however, I am going to hold an evidentiary hearing to determine the scope of injunctive relief. Specifically, it would be helpful to know how Macum pays for the right-of-way, what maintenance would be required while it was shut down, and who would have to pay for that.

## VI. CONCLUSION

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment (Dkt.# 76) is GRANTED, Defendant Macum Energy's Motion for Summary Judgment (Dkt.# 31) is DENIED, Defendant BLM's Motion for Summary Judgment (Dkt.# 94) is DENIED, and Plaintiffs' Motion for leave to submit subsequent authority (Dkt.# 124) is GRANTED.

IT IS FURTHER ORDERED:

(1) The BLM shall prepare an EIS for the oil and gas leasing program that covers the three leases herein;

(2) The BLM shall prepare an EA for the 1999 pipeline right-of-way;

(3) The BLM shall prepare a valid biological assessment of the oil and gas leasing program in conjunction with the EIS process;

(4) The BLM shall consult with all required entities, including nearby tribes, as required by NHPA;

(5) Macum Energy, Inc. shall not engage in any surface-disturbing activity on the three leases pending my decision on permanent injunctive relief;

(6) Macum Energy, Inc. shall shut down the pipeline pending my decision on permanent injunctive relief.

Additionally, IT IS ORDERED that the parties will appear for an evidentiary hearing to determine the scope of permanent injunctive relief on **July 8, 2004 at 10:00** **a.m. in the Paul G. Hatfield Courthouse, Helena, Montana.**

Plaintiffs are directed to make a separate motion for costs and attorneys' fees. The motion will be considered at the same hearing.